LEADER-PICONE & YOUNG, LLP
Malcolm Leader-Picone *(State Bar No. 104620)*
1970 Broadway, Suite 1030
Oakland, CA 94612
Telephone:  510-444-2404
Facsimile:  510-444-1291
Email:      mlp@leader-picone

Attorneys for Plaintiffs
ONE TRIPLE TWO, LLC
BENJAMIN DODGE
PATRICK LASSETER
ADAM BERKOWITZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ONE TRIPLE TWO, LLC, a California limited liability company; BENJAMIN DODGE, an individual; PATRICK LASSETER, an individual; and ADAM BERKOWITZ, an individual,<br><br>    Plaintiffs,<br><br>vs.<br><br>GEORGE DIVEL III, an individual; and DOES ONE through TWENTY, inclusive,<br><br>    Defendants. | No. _____<br><br>**COMPLAINT FOR:**<br>    **(1) BREACH OF CONTRACTS;**<br>    **(2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>    **(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>    **(4) FRAUD AND DECEIT;**<br>    **(5) NEGLIGENT MISREPRESENTATION; and**<br>    **(6) NEGLIGENCE.**<br><br>    <u>**DEMAND FOR JURY TRIAL**</u> |

          Come now Plaintiffs ONE TRIPLE TWO, LLC, BENJAMIN DODGE, PATRICK

LASSETER, and ADAM BERKOWITZ, by and through undersigned counsel, and allege as follows:

/ / / /

**COMPLAINT**

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as an action where the matter in controversy exceeds $50,000, exclusive of interest and costs, and is between citizens of California and a citizen of a foreign state.

2.      The transactions, matters and occurrences hereinafter alleged occurred entirely or in part in the Northern District of California, rendering this Court the proper venue for this action.

*3.*      This case is related to an action pending in the Superior Court of Alameda County, entitled *One Triple Two, LLC, et al. v. TCP 1222, LLC*, *et al*., Case No. RG19025509. Because the Alameda Superior Court quashed the state court service of GEORGE DIVEL, III, plaintiffs had no other option than to sue Mr. Divel in federal court.

**PARTIES**

**A.  PLAINTIFFS**

4.      Plaintiff ONE TRIPLE TWO, LLC ("ONE TRIPLE") is a California limited liability company with its principal office located at 317 Washington Street, Suite 120, Oakland, California  94607.

5.      Plaintiff BENJAMIN DODGE ("DODGE") is an individual residing in California.  DODGE is a managing member of ONE TRIPLE.

6.      Plaintiff PATRICK LASSETER ("LASSETER") is an individual residing in California.  LASSETER is a managing member of ONE TRIPLE.

7.      Plaintiff ADAM BERKOWITZ ("BERKOWITZ") is an individual residing in California.  BERKOWITZ is a managing member of ONE TRIPLE.

**B.  DEFENDANT**

8.      Defendant GEORGE DIVEL, III ("DIVEL") is an individual residing at 5020 Bee Frances Way, Clarksville, Maryland  21029.  Upon information and belief, DIVEL is managing member of TCP 1222 and TCP 1150.

**COMPLAINT**

-2-

**C.  DOE DEFENDANTS**

9.      The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants named DOES 1 through 10, inclusive, are unknown to Plaintiff, which therefore sues these Defendants by fictitious names.  Plaintiff will amend this Complaint to show the true names and capacities of these Defendants when they have been ascertained.  Plaintiff is informed and believes that each fictitiously named Defendant is responsible in law and fact for the obligations alleged herein.

**D.  ALTER EGO ALLEGATIONS**

10.      TCP 1222, LLC ("TCP 1222") is a Maryland limited liability company with its principal office located at 5020 Bee Frances Way, Clarksville, Maryland, 21029.

11.      TCP 1150, LLC ("TCP 1150") is a California limited liability company with its principal office located at 1150 Quesada Ave, San Francisco, California, 94124, engaged in commercial cannabis cultivation.

12.      MICHEL WARFIELD ("WARFIELD") is an individual residing at 406 Rhode Island Avenue NW, Washington D.C.  20001.   Upon information and belief, WARFIELD is a managing member of TCP 1222 and TCP 1150.

13.      Defendant DIVEL and WARFIELD, along with TCP 1150 and TCP 1222 are sometimes referred to herein as "Purchasers", since that is what they were doing in these transactions.

14.      At all times relevant hereto, TCP 1150 and TCP 1222 were the alter egos of Defendant DIVEL and WARFIELD, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist in that DIVEL and WARFIELD completely controlled, dominated, managed, and operated Defendant TCP 1150 and TCP 1222 to suit their convenience.

15.      Specifically, at all times relevant hereto, DIVEL and WARFIELD (1) controlled the business and affairs of TCP 1150 and TCP 1222, including any and all of their affiliates; (2) commingled the funds and assets of the corporate entities with their own and other business interests; (3) disregarded legal formalities and failed to maintain arm's length relationships

**COMPLAINT**

among the corporate entities and their personal affairs; (4) inadequately capitalized TCP 1150 and TCP 1222; (5) used the same office or business location and employees for TCP 1150 and TCP 1222, and their individual businesses and other corporate entities; (6) held themselves out as personally liable for the debts of TCP 1150 and TCP 1222; (7) used the corporate entities as a mere shells, instrumentalities or conduits for themselves and/or their individual businesses; (8) used the corporate entities to procure labor, services or merchandise for another person or entities; (9) manipulated the assets and liabilities between the corporate entities and their individual businesses and other corporate entities so as to isolate liabilities in TCP 1222; (10) used the corporate entities to conceal their ownership, management and financial interests and/or personal business activities; and/or (11) used the corporate entities to shield against personal obligations, and in particular the obligations as alleged in this Complaint.

16. At all times relevant thereto, TCP 1150 and TCP 1222 was not only influenced and governed by DIVEL and WARFIELD, but there was such a unity of interest and ownership that the individuality, or separateness, of DIVEL and WARFIELD and TCP 1150 and TCP 1222 has ceased, and that the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

17. Plaintiffs are informed and believe that at all relevant times mentioned herein, the acts of the business entities involved were performed by an employee, agent, officer, servant and/or representative of DIVEL, WARFIELD and TCP.

**E. AGENCY; AIDING AND ABETTING; AND CONSPIRACY**

18. Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each of the Defendants sued herein was the agent, employee, and/or alter ego of each of the remaining defendants and was at all times acting within the purpose and scope of such agency, employment, and representation.

19. At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment,

**COMPLAINT**

alter-ego and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

20.     As members of the conspiracies alleged more fully below, each of the Defendants participated and acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and have performed acts and made statements in furtherance of the conspiracy and other violations of California law.

21.     Each Defendant acted both individually and in alignment with the other Defendants with full knowledge of their respective wrongful conduct. As such, Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts outlined in this Complaint.

22.     Defendants are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## **FACTUAL ALLEGATIONS**

23.     On or about November 26, 2018, Plaintiffs entered into a purchase agreement ("Original Purchase Agreement") with TCP 1222 for the sale of: (i) certain assets held by ONE TRIPLE ("One Triple Assets"); (ii) eighty percent (80%) of the outstanding stock of Portland Innovations, a California corporation ("Portland Innovations") owned by Plaintiffs DODGE, LASSETER and BERKOWITZ ("Portland Stock"); and (iv) such other assets, rights and consideration, as more fully described in the Original Purchase Agreement ("Additional Consideration").  A copy of the Original Purchase Agreement is appended hereto as Exhibit "A" and made a part hereof by this reference.

24.     The One Triple Assets included, but are not limited to that certain lease (the "Lease Agreement") for the premises located at 1222 47th Avenue, Oakland, California (the "Premises"), and all tangible personal property, fixtures, leasehold improvements, trade fixtures, and equipment located at the Premises ("Premises Personal Property").  A copy of the Lease Agreement is

appended hereto as Exhibit "B" and made a part hereof by this reference.  The Premises intended use was for cannabis cultivation, manufacturing, distribution, and non-storefront retail, more commonly known as, delivery.

25.     Pursuant to the Original Purchase Agreement, the total purchase price for the One Triple Assets, the Portland Stock, and the Additional Consideration was two million and five hundred thousand dollars ($2,500,000) ("Purchase Price").

26.     On or about June 15, 2018, Plaintiff BERKOWITZ made the acquaintance of broker Kevin Windham ("Windham"), who informed Plaintiff BERKOWITZ that he had clients that would be interested in purchasing the operations of Portland Innovations, the One Triple Assets, and related cannabis assets and operations ("Project").  Windham would later disclose that his clients were DIVEL and WARFIELD.

27.     From June 15, 2018 until the execution of the Purchase Agreement, Windham assisted in facilitating the transaction contemplated by the Purchase Agreement ("Transaction") by acting as DIVEL and WARFIELD's broker (See Section 5.08 of the Purchase Agreement), most notably by assisting with troubleshooting the Transaction and communications.

28.     On or about June 20, 2018, Windham provided the names of DIVEL and WARFIELD as his clients, provided Plaintiffs with an executed confidentiality agreement signed by Windham and DIVEL and WARFIELD ("Confidentiality Agreement), and facilitated a tour of the Premises for his clients.").  A copy of the Confidentiality Agreement is appended hereto as Exhibit "C" and made a part hereof by this reference.

29.     On or about June 21, 2018, WARFIELD and William (Bill) Kirby ("Kirby") toured the Premises.

30.     Based upon information and belief, Kirby is the manager of the cannabis cultivation facility owned by TCP 1150 in San Francisco, California, but had not been formally employed or otherwise engaged by TCP 1222.

31.     On or about June 27, 2018, Windham sent Plaintiffs a "proof of funds" electronic mail ("Proof of Funds Email") as evidence of DIVEL and WARFIELD having sufficient

**COMPLAINT**

funds to consummate the Transaction.  A copy of the Proof Funds Email is appended hereto as Exhibit "D" and made a part hereof by this reference.  Later that day, with the understanding that DIVEL and WARFIELD had sufficient funds to consummate the Transaction, Plaintiffs provided Windham and DIVEL and WARFIELD with access to a cloud database that contained numerous files related to the Project.

32.     On or about July 13, 2018, Windham sent Plaintiff BERKOWITZ a letter of intent drafted by Defendant DIVEL, which would form the basis for the Transaction.

33.     On or about July 25, 2018, in performing its due diligence related to the Transaction, Defendant DIVEL arranged for Kirby to inspect the Premises with additional contractors.

34.     On or about November 17, 2018, in negotiating terms related to the Original Purchase Agreement, Defendant DIVEL disclosed that they were acquiring the Project to not only increase cannabis cultivation capacity, but to support their San Francisco cultivation project (run by TCP 1150) by providing distribution, manufacturing and retail/delivery capacity for that facility, as they could not acquire those licenses at the San Francisco location.  Defendant DIVEL also disclosed that it was their intention to take the cannabis activities of both its San Francisco facility and those occurring at the Premises public.

35.     On or about November 26, 2018, Defendant induced Plaintiffs into executing the Original Purchase Agreement in reliance upon the veracity of the Proof of Funds email, and representations made within the Original Purchase Agreement, itself.

36.     Pursuant to the Original Purchase Agreement, upon execution of the Original Purchase Agreement, TCP was required to make a payment in the amount of two hundred and fifty thousand dollars ($250,000) ("Closing Deposit") to Van de Poel, Levy, Arneal & Serot, LLP, as escrow agent ("Escrow Agent") to be held pursuant to the Original Purchase Agreement.  Based on a agreement between the Plaintiffs and the Purchasers, fifty thousand dollars ($50,000) of the Closing Deposit ("Access Payment") was made directly to Plaintiffs for access to the Premises to allow Purchasers to make improvements to the Premises, and two hundred thousand dollars ($200,000) of the Closing Deposit ("Partial Closing Deposit") was made to the Escrow Agent.

**COMPLAINT**

37.     Pursuant to the Purchase Agreement, at the closing of the sale of the Portland Shares and the One Triple Assets ("Closing"), Purchasers were required to release the Closing Deposit to Plaintiffs and pay seven hundred and fifty thousand dollars ($750,000) for a total of one million dollars ($1,000,000) ("Closing Payment") upon certain milestones being met by Plaintiffs.  These milestones included, Portland Innovations being in possession of a state cannabis cultivation license, GPORT being in possession of a state cannabis distribution license, the Premises having available power supply of 1600 amps ("Seller Obligations").

38.     Pursuant to the Original Purchase Agreement, ninety days (90) days from the Closing Date, Purchasers were required to make a three hundred thousand dollar ($300,000) payment ("Q1 Payment") to Plaintiffs.  Purchasers were also required to make two additional three hundred thousand dollar payments one hundred and eighty (180) days and two hundred and seventy (270) days, respectively, after the Closing Date ("Q2 Payment" and "Q3 Payment," respectively).  A final payment of six hundred thousand dollars ($600,000) ("Final Release Payment") was required to be made one year following the Closing Date.

39.     At Purchasers urging, Plaintiffs also agreed to cease all cultivation activities at the Premises for a period of not less than three weeks prior to the Closing, as Purchasers wanted to ensure that there was no pest infestation of the cultivation rooms.  On or about November 5, 2018, all cultivation activity was ceased in one of the two cultivation rooms, and on or about December 26th, 2018, all cultivation activity was ceased at the Premises.

40.     On or about February 4th, 2019, Plaintiffs notified Purchasers that all Seller Obligations had been met and sought the Closing to occur within five (5) days.

41.     On or about February 8th, 2019, Purchasers, by and through their attorney, Clare Schuller ("Schuller"), notified Plaintiffs that they were working through some "administrative issues," and asked to delay the Closing.  Defendant DIVEL subsequently explained that the "administrative issues" were related to transferring money from an investment retirement account ("IRA").  Defendant DIVEL led Plaintiffs to believe that the IRA was from his and/or Defendant WARFIELD's own IRA accounts.

**COMPLAINT**

42.     On or about February 11th, 2019, based on Defendant DIVEL's representations and assurances that the delay in closing was merely an administrative matter related to the transfer of funds from said IRA account, Plaintiffs were induced to amend the Original Purchase Agreement by and through an Amendment to the Original Purchase Agreement dated February 11, 2019 ("First Amendment").  A copy of the First Amendment is appended hereto as Exhibit "E" and made a part hereof by this reference.

43.     Pursuant to the First Amendment, Plaintiffs and Purchasers agreed (i) to immediately release one hundred and twenty thousand dollars ($120,000) of the Closing Deposit from the escrow held by the Escrow Agent; (ii) to extend the Closing to March 15, 2019; and (iii) to increase the Purchase Price to two million and five hundred thousand and twenty-five thousand dollars ($2,525,000).

44.     On or about February 12, 2019, one hundred and twenty thousand dollars ($120,000) of the Closing Deposit was released to Plaintiffs from the escrow by the Escrow Agent.

45.     On or about March 15, 2019, Defendant DIVEL notified Plaintiff BERKOWITZ via text message ("March 15 Text") that they did not have sufficient funds for Closing as the money intended for purchase had still not been able to be transferred from the previously referenced IRA, although Defendant DIVEL continued to assure Plaintiff BERKOWITZ that such monies would be transferred as soon as they were made available.  A copy of the March 15 Text is appended hereto as Exhibit "F" and made a part hereof by this reference.

46.     On or about March 15, 2019, based on representations and assurances made by Defendant DIVEL, Plaintiffs were induced to further amend the Original Purchase Agreement and the First Amendment by and through an Amendment to Purchase Agreement dated March 15, 2019 ("Second Amendment," and, together with the Original Purchase Agreement and the First Amendment, the "Purchase Agreement").  A copy of the Second Amendment is appended hereto as Exhibit "G" and made a part hereof by this reference.

47.     Pursuant to the Second Amendment, Plaintiffs and Purchasers agreed to (i) immediately release the remaining eighty thousand dollars ($80,000) of the Closing Deposit from the

**COMPLAINT**

escrow held by the Escrow Agent; (ii) Defendant immediately making a payment of one hundred thousand dollars ($100,000) to Plaintiffs, with such amounts to be credited towards the Purchase Price; (iii) to extend the Closing to March 20, 2019; (iv) to increase the Purchase Price to two million and five hundred thousand and fifty thousand dollars ($2,550,000); and (iv) have the remainder of the Closing Payment, seven hundred thousand dollars ($700,000), paid fifty thousand ($50,000) on March 29, 2019 and six hundred and fifty thousand dollars ($650,000) paid on April 15, 2019.

48.     On or about March 18, 2019, eighty thousand dollars ($80,000) of the Closing Deposit was released to Plaintiffs from the escrow by the Escrow Agent.

49.     On or about March 20, 2019, Plaintiffs took possession of the Premises and eighty percent (80%) of the shares of Portland Innovations were transferred by Plaintiffs DODGE, LASSETER and BERKOWITZ to Defendant.

50.     On or about March 20, 2019, Plaintiffs and Defendants entered into a Promissory Note, dated March 20, 2019 ("Promissory Note"), as contemplated by the Purchase Agreement, whereby Purchasers promised to make payment to Plaintiffs in an amount equal to one million and five hundred thousand dollars ($1,500,000).  A copy of the Promissory Note is appended hereto as Exhibit "H" and made a part hereof by this reference.

51.     On or about March 20, 2019, Plaintiffs and Purchasers entered into a Security Agreement, dated March 20, 2019 ("Security Agreement"), as contemplated by the Purchase Agreement, whereby Plaintiffs obtained a security interest in all of the interests and assets created by or transferred by means of the Purchase Agreement, including, but not limited to, (i) the One Triple Assets; (ii) the Portland Stock; (iii) fifty percent (50%) of the outstanding membership interests of GPORT, LLC, a California limited liability company ("GPORT Interest"); and (iv) the Premises Personal Property (collectively "Collateral"), to secure Defendants' obligations to Plaintiffs under the Purchase Agreement and the Promissory Note.  A copy of the Security Agreement is appended hereto as Exhibit "I" and made a part hereof by this reference.

52.     On or about March 20, 2019, pursuant to an electronic mail sent by Schuller to Plaintiff BERKOWITZ, Schuller informed Plaintiffs that Kirby would be the new authorized contact

**COMPLAINT**

-10-

for ONE TRIPLE's security company for the Premises and to provide Kirby with the keys to the Premises ("March 20 Transition Email").  A copy of the March 20 Transition Email is appended hereto as <u>Exhibit J.</u>

53.     On or about March 22, 2019, Kirby received the keys to the Premises from Plaintiff LASSETER.

54.     On or about March 29, 2019, in response to an inquiry about the status of the $50,000 payment due, Defendant DIVEL responded via text message that the "IRA cash" wasn't yet available, but that Defendant WARFIELD would make payment from the proceeds of a sale by TCP 1150 to a dispensary for cannabis products ("March 29 Text").  A copy of the March 29 Text is appended hereto as <u>Exhibit K</u>.

55.     On or about March 29, 2019, Defendants made a payment of forty thousand dollars ($40,000) to Plaintiffs.

56.     On or about April 1, 2019, Defendant DIVEL informed Plaintiff BERKOWITZ that Kirby had deposited a check received from a "distributor" that morning so payment would be made the following morning.  Upon information and belief, the "distributor" made payment to TCP 1150 for the sale of cannabis product cultivated at TCP 1150's San Francisco facility.

57.     On or about April 2, 2019, Defendants made a payment of ten thousand dollars ($10,000) to Plaintiffs.

58.     On or about April 15, 2019, Purchasers notified Plaintiffs that they did not have sufficient funds for Closing as they were still waiting on the IRA funds.  Later that day, Purchasers came clean and disclosed that they had been relying on investor funds all along and that their investors had backed out.  This was the first time Plaintiffs were notified that Purchasers were relying on outside investors to meet their obligation to make payments pursuant to the Purchase Agreement.

59.     Plaintiffs have breached the Purchase Agreement by failing to comply with the payment terms therein, specifically they have failed to make full payment of the Closing Payment and payment of the Q1 Payment.

**COMPLAINT**

60.     Plaintiffs, on the other hand, have complied with and/or exceeded their obligations under the Purchase Agreement.

61.     The Purchase Agreements sets forth specific penalties, both monetary and non-monetary, for Plaintiffs failure to abide the terms of the Purchase Agreement.

62.     Based on Purchasers' assurances, Plaintiffs repeatedly attempted to resolve Defendants' failures to abide by the terms of the Purchase Agreement, by amending the Purchase Agreement, and otherwise, but Purchasers still failed to fulfill their obligations under the Purchase Agreement.

63.     Following Purchasers taking possession of the Premises, Purchasers repeatedly failed to make timely or due payments to the owner of the Premises, Ed Hemmat d/b/a Five 10, LLC ("Landlord"), pursuant to the Lease Agreement.

64.     Following Purchasers taking possession of the Premises, Purchasers repeatedly failed to make timely or due payments to utility companies providing utilities to the Premises.

65.     Following Purchasers taking possession of the Premises, Purchasers repeatedly failed to properly maintain or secure the Premises resulting in multiple burglaries, the theft of Premises Personal Property, and the destruction of doors and improvements to the Premises.

66.     On multiple occasions, Purchasers failed to respond to alarm calls related to intrusions at the Premises.

67.     On or about June 11, 2019, in an effort to protect the Collateral, Plaintiffs facilitated the repair and replacement of doors to the Premises damaged by thieves.

68.     On or about June 12, 2019, Purchasers surrendered the Premises to the Landlord for failure to make rent payments.

69.     In order to mitigate their damages and in an attempt to preserve the value of the Personal Property Collateral, the Plaintiffs, on or about June 18, 2019, entered into an agreement with the Landlord to obtain possession of the Premises.

70.     On July 2, 2019, Plaintiffs commenced an action against all of the Purchasers, including defendant DIVEL, in the Alameda County Superior Court, entitled *One Triple Two, LLC, et*

**COMPLAINT**

-12-

*al. v. TCP 1222, LLC*, *et al*., Case No. RG19025509. Purchasers all appeared in that action , except for defendant DIVEL who moved to quash service on the grounds that the California court could not obtain personal jurisdiction over him.

71.     Without prejudice to any of its rights against Purchasers, but in order to mitigate damages, Plaintiffs and Purchasers entered into a Surrender of Collateral Agreement, effective October 16, 2019, whereby Purchasers relinquished any and all right, title and interest in the Collateral and transferred the Collateral back to Plaintiffs so that Plaintiffs could endeavor to find another purchaser of the Collateral. A true and correct copy of the Surrender of Collateral Agreement is attached hereto as Exhibit "L".

72.     Subsequently, Plaintiffs have mitigated their damages to the full extent possible under all the circumstances, which circumstances include the worldwide COVID-19 Pandemic, by selling the Collateral to the landlord of the Premises for total consideration of $750,000.00; consisting of $450,000 in cash and $300,000 in debt forgiveness. Attached hereto as Exhibit "M", and made a part by this reference, is a true and correct copy of the Lease Surrender Sale Agreement.

## FIRST CLAIM FOR RELIEF
(Breach of Purchase Agreement)

73.     By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 72, inclusive.

74.     As set forth above, TCP 1222 breached the Purchase Agreement with Plaintiffs by failing to make certain payments when due and failed to perform its obligation under that agreement. Defendant DIVEL as *alter ego* of TCP 1222 is liable for all damages proximately caused by that breach of contract.

75.     Plaintiffs have performed all of their obligations under the Purchase Agreement.

76.     TCP 1222's breaches of the Purchase Agreement have caused harm and damages to Plaintiffs in an amount to be determined at trial according to proof, but not less than the balance of the purchase price, $2,550,000, less mitigation of $750,000.

/ / / /

**COMPLAINT**

## SECOND CLAIM FOR RELIEF
### (Breach of Security Agreement)

77.     By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 76, inclusive.

78.     Plaintiffs and TCP 1222 entered into the Security Agreement.

79.     As set forth above, TCP 1222 breached the Security Agreement with Plaintiffs and failed to perform its obligation under that agreement by failing to defend the Collateral against third-party claims; encumbering the Collateral; failing to keep the Collateral insured against risk of loss or damage; failing to keep the Collateral free from any adverse lien; failing to keep the Collateral in good repair, and not wasting or destroying the Collateral; failing to pay all taxes and assessments upon the Collateral when due; and failing to repay and reimburse Plaintiffs for Plaintiffs repair and preservation of the Collateral. Defendant DIVEL as *alter ego* of TCP 1222 is liable for all damages proximately caused by that breach of contract.

80.     Plaintiffs have performed all of their obligations under the Security Agreement.

81.     TCP 1222 breaches of the Security Agreement have caused harm and damages to Plaintiffs in an amount to be determined at trial according to proof, but not less than $34,941.14.

## THIRD CLAIM FOR RELIEF
### (Breach of Promissory Note)

82.     By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 81, inclusive.

83.     Plaintiffs and TCP 1222 entered into the Promissory Note by which TCP 1222 promised to pay plaintiff a total of $1,500,000.

84.     As set forth above, TCP 1222 breached the Promissory Note with Plaintiffs and failed to perform its obligation under that agreement by failing to make certain payments when due and failed to perform its obligation under that agreement. Due to the breach, plaintiff have declared all amounts due under the promissory note immediately due and payable. Defendant DIVEL as *alter ego* of TCP 1222 is liable for all damages proximately caused by that breach of contract.

**COMPLAINT**

85. Plaintiffs have performed all of their obligations under the Promissory Note.

86. The breaches of the Promissory Note have caused harm and damages to Plaintiffs in an amount to be determined at trial according to proof, but not less than the balance of the Note, $1,500,000, less mitigation of $750,000.

### FOURTH CLAIM FOR RELIEF
(Intentional Interference with Prospective Economic Advantage)

87. By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 86, inclusive.

88. In essence, this Transaction had the intent to have Plaintiffs and Purchasers realize substantial profits from the cultivating, manufacturing, distributing and retailing cannabis and cannabis products on the Premises. Plaintiffs suspended their business of cultivating, manufacturing, distributing and retailing cannabis and cannabis products on the Premises in reliance on Purchasers promises in the Purchase Agreement, the Security Agreement and the Promissory Note and Defendant DIVEL's affirmative representations of fact such as the Proof of Funds.

89. By falsely promising to perform under the Purchase Agreement, the Security Agreement, and the Promissory Note, and falsely representing their ability to pay the purchase price for the assets, Defendant DIVEL obtained possession and control of the assets and Plaintiffs' business in the Premises.

90. Defendant DIVEL's conduct as herein alleged was done with the knowledge and intent that it would cause injurious interference with Plaintiffs' prospective economic advantage.

91. The above-described actions and inactions by Defendant DIVEL constitute wrongful conduct outside the boundaries of fair competition.

92. Defendant DIVEL had knowledge of Plaintiffs' prospective business advantage and intended to interfere with Plaintiffs' prospective business advantage.

93. Because of the injurious interference of Defendant DIVEL, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial according to proof, but not less than the balance of the purchase price, $2,550,000, less mitigation of $750,000.

**COMPLAINT**

94.     Upon information and belief, Defendant DIVEL acted with oppression, fraud, malice, and conscious disregard of the rights of Plaintiffs when doing the acts set forth above.  Thus, Plaintiffs are entitled to recover punitive and exemplary damages according to proof, pursuant to Cal. Civil Code section 3294.

**FIFTH CLAIM FOR RELIEF**
(Negligent Interference with Prospective Economic Advantage)

95.     By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 94, inclusive.

96.     In the alternative to the Fourth Claim for Relief for Intentional Interference with Prospective Advantage, Plaintiffs plead this Fifth Claim for Relief for Negligent Interference with Prospective Economic Advantage against Defendant DIVEL.

97.     By falsely promising to perform under the Purchase Agreement, the Security Agreement, and the Promissory Note, and falsely representing their ability to pay the purchase price for the assets, Defendant DIVEL obtained possession and control of the assets and Plaintiffs' business in the Premises.

98.     Defendant DIVEL knew or should have known that their conduct as herein alleged would cause injurious interference with Plaintiffs' prospective economic advantage.

99.     The above-described actions and inactions by Defendant DIVEL constitute wrongful conduct outside the boundaries of fair competition.

100.    Because of the injurious interference of Defendant DIVEL, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial according to proof, but not less than the balance of the purchase price, $2,550,000, less mitigation of $750,000.

**SIXTH CLAIM FOR RELIEF**
(Intentional Misrepresentation)

101.    By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 100, inclusive.

**COMPLAINT**

102.     Defendant DIVEL, individually and as the principal of TCP 1150 and TCP 1222, represented to Plaintiffs that he and WARFIELD had the ability to make all payments due under the Purchase Agreement.  In exchange for Plaintiff's execution of the Original Purchase Agreement, as well as subsequent amendments, and Plaintiff's transfer of the Collateral, individually and as the principals of TCP 1150 and TCP 1222, Defendant DIVEL promised Plaintiffs that he and WARFIELD had the means to make, and that Plaintiffs would receive, all amounts due under the Purchase Agreement. Those representations were false and Defendant DIVEL knew they were false when he made them. Defendant DIVEL made the promises in the Purchase Agreement, the Security Agreement and the Promissory Note without the intention to perform.

103.     Defendant DIVEL and WARFIELD, through their agents, individually and as the principals of TCP 1150 and TCP 1222, intended that Plaintiffs rely on their misrepresentations in executing the Original Purchase Agreement, as well as subsequent amendments, and in Plaintiff's transfer of the Collateral to Purchasers.

104.     Based on the Proof of Funds Email, numerous verbal and written representations by both Defendant DIVEL and WARFIELD and their attorney, Schuller, and as further identified herein, Plaintiffs justifiably relied on the promises, assertions and representations made by Defendant DIVEL in inducing Plaintiff's to transfer the Collateral to Defendants.

105.     Defendant DIVEL'S conduct as herein alleged proximately caused harm to Plaintiffs.  Plaintiffs suspended their operation of the Project, and eventually had to sell the Project off to the landlord at a huge discount in order to mitigate their damages. In addition, Plaintiffs lost significant business relationships and opportunities within the cannabis industry.

106.     Plaintiffs' reasonable reliance on Defendants' misrepresentations were a substantial factor in causing their harm and caused harm in an amount according to proof at trial, but not less than the balance of the purchase price, $2,550,000, less mitigation of $750,000.

107.     The wrongful acts of Defendants, and each of them, were done maliciously, oppressively, and with intent to defraud. Plaintiff is therefore entitled to punitive and exemplary damages in an amount according to proof.

**COMPLAINT**

1

2

## SEVENTH CLAIM FOR RELIEF
(Negligent Misrepresentation)

3

4

108.    By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 107, inclusive.

5

6

7

8

9

10

11

12

109.    As set forth above, Defendant DIVEL and WARFIELD, through their agents Windham and Schuller, individually, and as the principals of TCP 1222 and TCP 1150, made promises and affirmative misrepresentations about material facts regarding their ability to make all payments due under the Purchase Agreement.  In exchange for Plaintiff's execution of the Original Purchase Agreement, as well as subsequent amendments, and Plaintiff's transfer of the Collateral, individually and as principals of TCP 1222 and TCP 1150, Defendant DIVEL promised Plaintiffs that he and WARFIELD had the means to make, and that Plaintiffs would receive two million and five hundred thousand dollars ($2,500,000).

13

14

15

110.    Although Defendant DIVEL and WARFIELD may have believed that the foregoing representations were true, they had no reasonable grounds for believing the representations were true when they made them.

16

17

18

111.    Defendant DIVEL and WARFIELD, individually and as the principals of TCP 1150 and TCP 1222, intended that Plaintiffs rely on their representations in executing the Original Purchase Agreement and subsequent amendments, and in transferring the Collateral to Purchasers.

19

20

21

22

112.    Based on the Proof of Funds Email, numerous verbal and written representations by both Defendant DIVEL and WARFIELD and their attorney, Schuller, and as further identified herein, Plaintiffs justifiably relied on the promises, assertions and representations made by Defendant DIVEL in inducing Plaintiffs to transfer the Collateral to Purchasers.

23

24

113.    Defendant DIVEL failed to abide by his promises and had no reasonable basis to ever have believed that he would honor his promises.

25

26

114.    Plaintiffs' reliance on Defendant's misrepresentations caused Plaintiffs to suffer damages.  Plaintiffs have suffered, and will continue to suffer, such damages in an amount to be

27

28

**COMPLAINT**

determined at trial according to proof, but not less than the balance of the purchase price, $2,550,000, less mitigation of $750,000.

## EIGHTH CLAIM FOR RELIEF
### (Negligence)

115.    By this reference, Plaintiffs incorporate and reallege, as though fully set forth, the allegations of paragraphs 1 through 114, inclusive.

116.    Defendants, and each of them, owed Plaintiffs a duty of due care.  Defendants, and each of them, were negligent in failing to defend the Collateral against third-party claims, encumbering the Collateral, failing to keep the Collateral insured against risk of loss or damage, failing to keep the Collateral free from any adverse liens, failing to keep the Collateral in good repair, and not wasting or destroying the Collateral, and failing to pay all taxes and assessments upon the Collateral when due.

117.    In failing to defend the Collateral against third-party claims, encumbering the Collateral, failing to keep the Collateral insured against risk of loss or damage, failing to keep the Collateral free from any adverse liens, failing to keep the Collateral in good repair, and not wasting or destroying the Collateral, and failing to pay all taxes and assessments upon the Collateral when due, Defendants, and each of them, caused Plaintiffs to suffer harm that they will continue to suffer.

118.    Defendants' negligence caused Plaintiffs damages in an amount to be determined at trial according to proof, but of not less than $34,941.14.

## DEMAND FOR JURY TRIAL

119.    Plaintiffs reserve the right to a jury trial of their claims, as applicable.

**WHEREFORE**, Plaintiffs demand relief against Defendants on each Claim for Relief, as follows:

On the First Claim for Relief for Breach of Contract:

1.    For compensatory damages, in an amount of not less than $2,550,00;

2.    For prejudgment interest at the legal rate;

**COMPLAINT**

3.    For reasonable attorneys' fees, as allowed under the applicable agreements;

On the Second Claim for Relief for Breach of Contract:

4.    For compensatory damages, in an amount of not less than $34,941.14;

5.    For prejudgment interest at the legal rate;

6.    For reasonable attorneys' fees, as allowed under the applicable agreements;

On the Third Claim for Relief for Breach of Contract:

7.    For compensatory damages, in an amount of not less than $1,050,00;

8.    For prejudgment interest at the legal rate;

9.    For reasonable attorneys' fees, as allowed under the applicable agreements;

On the Fourth Claim for Relief for Intentional Interference:

10.   For all lost profits and expenses incurred and for all detriment proximately caused, in an amount of not less than $$1,800,000;

11.   For exemplary damages under California Civil Code section 3294 according to proof;

On the Fifth Claim for Relief for Negligent Interference:

12.   For all lost profits and expenses incurred and for all detriment proximately caused, in an amount of not less than $1,800,000;

On the Sixth Claim for Relief for Intentional Misrepresentation:

13.   For damages to compensate Plaintiffs for all the detriment proximately caused by the fraudulent conduct, in an amount of not less than $1,800,000;

14.   For exemplary damages under California Civil Code section 3294 according to proof;

On the Seventh Claim for Relief for Negligent Misrepresentation:

15.   For damages to compensate Plaintiffs for all the detriment proximately caused by the tortious conduct, in an amount of not less than $1,800,000;

On the Eighth Claim for Relief for Negligence:

16.   For damages to compensate Plaintiffs for all the detriment proximately caused

**COMPLAINT**

by the negligent conduct, in an amount of not less than $34,941.14;

On all Causes of Action:

17.    For costs of suit herein incurred; and

18.    For such other and further relief as the Court deems just and proper.

DATED:  April 26, 2021.                    LEADER-PICONE & YOUNG, LLP

BY:  _____
        MALCOLM LEADER-PICONE
        Attorneys for Plaintiffs
        ONE TRIPLE TWO, LLC; BENJAMIN DODGE;
        PATRICK LASSETER; and ADAM BERKOWITZ

**COMPLAINT**