IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| ONE TRIPLE TWO, LLC ET AL., | * |
| Plaintiffs, | * |
| v. | * |
| GEORGE DIVEL III, | *    Civil No. 22-2027-BAH |
| Defendant. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs One Triple Two, LLC, ("One Triple"), Benjamin Dodge ("Dodge"), Patrick Lasseter ("Lasseter"), and Adam Berkowitz ("Berkowitz") (collectively, "Plaintiffs") brought this suit against Defendant George Divel III ("Divel" or "Defendant"),[1] alleging several contract and tort claims relating to an underlying business transaction. ECF 1, at 1, 13–21. Pending before the Court is Divel's motion for summary judgment. ECF 90. Plaintiffs filed an opposition, ECF 93, and Divel filed a reply, ECF 96. The Court has also reviewed Divel's motion seeking judicial notice of particular records. *See* ECF 97. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Divel's motion for judicial notice and motion for summary judgment will be **GRANTED**.

---

[1] Plaintiffs also originally brought suit against twenty unidentified John Does. *See* ECF 63, at 1. As the complaint does not plead any facts that reference the John Doe defendants or in any way indicate their involvement with the events underlying this action, the Court previously dismissed the complaint without prejudice with respect to the John Doe defendants. *See id.* at 1 n.1.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.    BACKGROUND

### A.    Factual Background

This case arises out of an alleged failed agreement for an entity with which Divel is affiliated, TCP 1222, LLC ("TCP 1222"), to purchase the vast majority of One Triple's assets and 80% of the shares held by the individual Plaintiffs in another entity, Portland Innovations ("Portland"). ECF 1, at 5; ECF 90-6 (the "Purchase Agreement"); *see also* ECF 93-3 (same). Specifically, Plaintiffs seek to hold Divel liable for purported misrepresentations relating to the financial ability of his group to complete the purchase of Plaintiffs' cannabis business in 2019. *See id.* at 16–19.

#### 1.    The Failed Deal

In mid-2018, Plaintiffs decided to sell their Oakland, California-based cannabis cultivation business. *See* ECF 93-2, at 2 ¶ 5. On June 14, 2018, Berkowitz interacted with a business broker named Kevin Windham, and Berkowitz told Windham that he had "a great cannabis business for you to sell." ECF 90-3, at 2, 7; *see* ECF 93-2, at 2 ¶ 5. At that point in time, Plaintiffs' business had been running for about a year and a half with varying degrees of success, although the parties dispute how profitable the business really was. *Compare* ECF 90-1, at 2, *with* ECF 93, at 11. Berkowitz testified that from an "operational capacity . . . on an ongoing basis" the business was only "near break even." ECF 90-26, at 5:40 (Berkowitz Deposition). On July 13, 2018, Lasseter sent Berkowitz and Dodge an email laying out the purpose behind the sale, at least from his perspective, in stark terms: "[T]he goal is to exit, not invest another year and more money into the project. . . . I can't stay responsible for this business, the truth is it's failing, and the main point is to be able to sell and get out [from] under this." ECF 90-5, at 2. Berkowitz, however, disagreed that the business was failing. *See* ECF 90-26, at 6:43.

The tax documents for Plaintiffs' business suggest it had approximately $123,150 in total income in 2017 and $259,519 in 2018. *See* ECF 93-8, at 2 (tax return for 2017); *id.* at 3 (tax return for 2018); ECF 90-17, at 6; *see also* ECF 90-26, at 5:39. Berkowitz claims that the business's tax returns showed profits in both 2017 and 2018. ECF 93-2, at 5 ¶ 27. Although Berkowitz does not identify specific numbers, the tax documents reflect $25,266 of taxable income in 2017 and $20,375 of taxable income in 2018. ECF 93-8, at 2–3. Berkowitz asserts that the profits in 2018 "would have been $200,000 greater had it not been for a break-in and the theft of $200,000 in product." ECF 93-2, at 5–6 ¶ 27.

Soon after Berkowitz told Windham about the sale opportunity, Windham connected Plaintiffs with Michel Warfield ("Warfield") and Divel. *See* ECF 93-2, at 2 ¶ 5. Windham had met Warfield and Divel months earlier in connection with an unrelated matter, and he knew that they were looking to acquire California-based cannabis businesses. *See* ECF 90-37, at 2 ¶¶ 5–6. In connection with that previous deal, but without Divel's authorization, Warfield sent Windham screenshots reflecting certain bank account information from Divel's Bank of America dashboard. *Id.* ¶ 6. Windham later shared those screenshots with Plaintiffs, without Warfield or Divel's knowledge at the time, as a form of assurance that Divel and Warfield had funds sufficient to handle a purchase in the $2 to $3 million range. *Id.* ("I did not authorize Windham to share those screenshots with Plaintiffs or to use them outside of that earlier unrelated deal, and I did not learn that he had done so until much later when Plaintiffs filed suit against me in California."); *see also* ECF 93-1, at 6, 102:21–23, 103:4–10; ECF 90-10. Specifically, on June 17, 2018, Windham sent Plaintiffs an email including a screenshot listing fifteen different entity accounts with deposits totaling $2,770,771.69. *See* ECF 90-10, at 2–5 (email from Windham to Berkowitz including

3

screenshot of accounts). Windham represented that these were funds that Divel controlled and could draw upon for the purchase. *Id.* at 2 ("POF on buyers Mike Warfield & George Divel.").

Between June and November of 2018, Plaintiffs negotiated the sale of their business to TCP 1222, communicating with Divel, Warfield, their lawyer (Clare Schuller), and Windham, who Berkowitz recalls Divel referring to as a part of his "team." ECF 93-2, at 3 ¶ 7, at 7 ¶ 34; ECF 90-36, at 2 ¶ 7. Divel and Warfield formed TCP 1222 specifically for the purpose of acquiring Plaintiffs' business. ECF 90-37, at 2 ¶ 4. Warfield and Divel were the managing members of TCP 1222 at the time of the transaction, but their intention was to fund the acquisition of Plaintiffs' business through outside investment. *Id.* The acquisition of Plaintiffs' business was intended as part of a plan to ultimately build a publicly-traded cannabis company under the "TCP" brand. ECF 90-37, at 2 ¶ 2. Prior to forming TCP 1222, Warfield and Divel had acquired a San Francisco based cannabis business in the same manner in which they attempted to acquire Plaintiffs' business. *Id.* ¶ 3. They obtained outside investment to fund the purchase of that company through a company they formed called TCP 1150. *Id.*

On November 26, 2018, TCP 1222 entered into the Purchase Agreement, with Warfield and Divel both signing as Managing Members of TCP 1222. *See* ECF 90-6. For "One Triple Assets," and 80% of shares held by the individual Plaintiffs in another entity, Portland Innovations, TCP 1222 agreed to pay $2.5 million. ECF 90-6, at 2, 6; *see also* ECF 90-32, at 8 (assignment and transfer of stock). The agreement defined "One Triple Assets" as "all of the assets owned by One Triple as of the Execution Date, as more specifically set forth in Schedule 2.02" of the Purchase Agreement. ECF 90-6, at 4. Schedule 2.02 specified that such assets included (1) the "[r]eal property lease for the Premises executed with Ed Hemmat/Five 10," (2) the "[o]ption to purchase 1222 47th Ave, Oakland CA," and (3) "[a]ll personal property, fixtures, leasehold

4

improvements, trade fixtures, and equipment located at the Premises, including but not limited to .all of the tables/lights/HVAC/electrical and other technical equipment" at One Triple's Okland facility. *Id.* at 26; ECF 90-32, at 2 (surrender of collateral agreement); ECF 90-9, at 2 (commercial lease agreement between Hemmat d/b/a Five 10, LLC and One Triple). The shares in Portland Innovations is defined by the agreement as the "Portland Shares," which the individual Plaintiffs owned 100% of. ECF 90-6, at 4. The individual Plaintiffs would have maintained 20% of shares in Portland Innovations for administrative purposes, with no voting ability and no right to collect dividends. *Id.* at 2.

TCP 1222 was required to put $250,000 as a closing deposit to be held by an escrow agent once the agreement was signed. *Id.* at 6. Of the total purchase price, $1 million was to be paid at closing, with the balance to be paid in installments over the following year. *Id.* The agreement further required a Promissory Note for the balance of the Purchase Price, secured by the business assets that TCP 1222 was purchasing. *Id.* On Plaintiffs' side of the agreement, they were required to cease growing cannabis in the subject premises, upgrade the electrical system in the premises to enable an "available power supply of 1600 amps," and transfer the business assets specified in the agreement. *See id.* at 8, 10; ECF 93-2, at 4 ¶ 20 (Berkowitz noting that the electrical system upgrade cost "approximately $400,000").

The Purchase Agreement also contained a buyer representation and warranty that TCP 1222 had either the requisite funds or binding commitments necessary to complete the purchase. ECF 90-6, at 16. Specifically, the agreement stated:

> Buyer has all monies or appropriate binding commitments from responsible financial institutions to provide Buyer with funds sufficient to satisfy the obligations of Buyer to Seller under this Agreement and capital sufficient to conduct the business of the Acquired Company to be acquired pursuant to this Agreement. All such financing commitments remain in full force and effect.

5

*Id.* At the time the Purchase Agreement was executed, TCP 1222 had secured a commitment for a multi-million-dollar investment to fund the acquisition. ECF 90-37, at 3 ¶ 8. However, according to Divel, the commitment fell through shortly thereafter, when the investor-to-be, a doctor, received belated legal advice that the investment could jeopardize her medical license. *Id.*

Nevertheless, TCP 1222 attempted to fulfill the agreement. *See id.* ¶¶ 9–10. TCP 1222 requested and Plaintiffs granted two amendments to the Purchase Agreement to delay the closing, making various payments and adding $25,000 to the purchase price each time.[3] *Id.* ¶ 10; *see* ECF 90-7 (first amendment); ECF 90-8 (second amendment). The parties agreed to close the purchase before TCP 1222 had completed the closing payment under the amended Purchase Agreement. ECF 90-37, at 3 ¶ 11. In total, TCP 1222 paid One Triple Two $400,000 towards the purchase price.[4] *Id.* at ¶ 12; ECF 93-2, at 5 ¶ 25. However, TCP 1222 was unable to complete the amended closing payment, which resulted in Plaintiffs declaring breach and moving to reclaim the secured One Triple Two business assets. ECF 90-37, at 3 ¶ 13. On October 16, 2019, TCP 1222 released those assets back to Plaintiffs. *See* ECF 90-32 (surrender of collateral agreement).

The parties dispute whether One Triple had other interested purchasers throughout the relevant time period. While Berkowitz sent Windham text messages suggesting that Plaintiffs had "two other active potential purchasers" and that there was another party touring the facility,

---

[3] On December 17, 2018, TCP 1222, LLC made a payment of $50,000.00. ECF 93-2, at 3 ¶ 10. Pursuant to the first amendment to the Purchase Agreement, on February 12, 2019, TCP 1222 immediately released $120,000 of the closing deposit from the escrow and increased the purchase price by $25,000. ECF 90-7, at 2; ECF 93-2, at 3 ¶ 12. Pursuant to the second amendment, on March 18, 2019 the remaining $80,000 of the closing deposit was released from the escrow and the purchase price was raised by another $25,000. ECF 90-8, at 2; ECF 93-2, at 4 ¶ 15. TCP 1222 also made a payment of $100,000. EF 90-8, at 2; ECF 93-2, at 4 ¶ 15. On March 29, 2019, TCP 1222 made a payment of $40,000. ECF 93-2, at 4 ¶ 17. Finally, on April 2, 2019, TCP 1222 paid $10,000 to Plaintiffs. *Id.* ¶ 18.

[4] *See supra* note 3.

6

Berkowitz admitted at his deposition that he may have been "bullshitting . . . just to make people more interested." ECF 90-31, at 2; ECF 90-26, at 9:150; *id.* at 11:165. Further, Berkowitz was unable to identify any specific alternative buyers at his deposition. *See id.* at 11:167. And Plaintiffs generally acknowledge that at the time they were "negotiating and entering into the Purchase Agreement with TCP 1222, LLC, there were not other advanced alternative buyers." ECF 90-17, at 6. However, Berkowitz now asserts in his declaration that he "was in the process of negotiating a sale transaction in November 2018 with Amenta, LLC" and that "in reliance on Divel's assurances that TCP 1222, LLC had the funds to purchase the assets, [he] stopped negotiations with Amenta, LLC and proceeded with executing the Original Purchase Agreement with Divel on November 26, 2018." ECF 93-2, at 6 ¶ 29.

After the failed TCP 1222 deal, Plaintiffs sold the business collateral—including the leasehold and equipment—to their landlord for $750,000. ECF 90-15, at 4; ECF 93-2, at 5 ¶ 24. The consideration included $400,000 in cash and $300,000 in debt forgiveness. *Id.*

### 2.    The California Lawsuit

On July 2, 2019, Plaintiffs filed an action in the Alameda County Superior Court in California against TCP 1222, Defendant, and all of Defendant's associates and other affiliated entities involved in the failed sale. *See* ECF 90-14. On Divel's motion, the California court quashed service on Divel based on the lack of personal jurisdiction over him. *See* ECF 90-33. However, the California suit proceeded against the other three defendants, TCP 1222, TCP 1150, and Warfield. *See id.* at 4.

After the Alameda County Superior Court quashed service of Defendant in the state court action, Plaintiffs filed this lawsuit in the United States District Court for the Northern District of California, Oakland Division. ECF 1, at 1–2. However, in response to Defendant's continued insistence that the courts of California, both at the state and federal level, lack personal jurisdiction

7

over him, Plaintiffs moved to transfer the case to this Court, as Defendant is a resident of Maryland. ECF 32, at 1–2. The California District Court granted this motion, ECF 34, and the case was transferred to this Court in August 2022, ECF 35.

In the midst of the California state court litigation, the California Franchise Tax Board suspended One Triple. ECF 90-12, at 2 (listing inactive date as "10/01/2019"); ECF 90-27, at 14:296–97. It was never reinstated. *See id.* On October 14, 2024, Plaintiffs dismissed their complaint in the California suit with prejudice. *See* ECF 90-34. According to their Rule 26 disclosures, Plaintiffs received $85,000 from Warfield in a settlement. *See* ECF 90-35, at 4. Plaintiffs also maintained the $400,000 provided in deposits by TPC 1222 pursuant to the Purchase Agreement. *See* ECF 93-2, at 5 ¶ 25.

**B.    Procedural History**

The complaint, originally filed on June 30, 2021, asserted eight counts against Divel in this action: (1) breach of the Purchase Agreement; (2) breach of the security agreement; (3) breach of the promissory note; (4) intentional interference with prospective economic advantage; (5) negligent interference with prospective economic advantage; (6) intentional misrepresentation; (7) negligent misrepresentation; and (8) negligence. ECF 1, at 13–19. On November 3, 2023, Divel moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6), which Plaintiffs opposed. *See* ECF 60 (Divel's motion to dismiss); ECF 61 (Plaintiffs' opposition); ECF 62 (Divel's reply). On May 13, 2024, the Court granted in part and denied in part Divel's motion, dismissing counts one, two, three, four, five, and eight of Plaintiffs' complaint without prejudice. ECF 63 (memorandum opinion); ECF 64 (order). Only Plaintiffs' intentional and negligent misrepresentation claims remain.[5] *See id.* The Court noted that California

---

[5] On September 13, 2024, Plaintiffs filed an opposed motion for leave to amend their complaint with additional facts to support the contention that Divel was the alter ego of TCP 1222 LLC and

substantive law applies to those claims. *See* ECF 63, at 8–9. On February 13, 2026, Divel filed a motion for summary judgment on those claims. *See* ECF 90. That motion is now ripe for resolution.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 372 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

---

to support a claim of interference with prospective, economic advantage, which Divel opposed. *See* ECF 73 (Plaintiffs' motion for leave to amend); ECF 74 (Divel's opposition). The Court ultimately denied Plaintiffs' motion to amend. ECF 75 (memorandum opinion); ECF 76 (order).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)).  For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 372 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

Divel argues that after six years of time to develop the case, Plaintiffs "still cannot establish damages or proximate causation—essential elements of both their intentional and negligent misrepresentation claims." ECF 90-1, at 14.  Divel contends that because Plaintiffs cannot designate specific facts showing that there is a genuine issue for trial as to either issue, summary judgment is warranted in Divel's favor. *Id.* at 15.

The Court reviews the elements of Plaintiffs' remaining claims under California law.  To state a claim for intentional misrepresentation, also known as fraud, a plaintiff must plead "(1) a

10

misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004) (citing *Lazar v. Superior Court*, 909 P.2d 981, 984 (Cal. 1996)). The elements for negligent misrepresentation are much the same, except that instead of acting with "knowledge of falsity," the defendant must have acted "without reasonable ground for believing [the alleged misrepresentation] to be true." *Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 311 Cal. Rptr. 3d 564, 593 (Cal. Ct. App. 2023).

Causation is inherent in the concept of reliance. "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 608–09 (Cal. 1995) (citation omitted). Thus, at this stage of proceedings, Divel challenges whether Plaintiffs have established a genuine dispute of material fact as to the fourth and fifth elements of their misrepresentation claims.

### A. Corporate Capacity and Damages

As an initial matter, the Court addresses whether Plaintiff One Triple Two, LLC, the corporate entity involved as a seller in the Purchase Agreement, can even sue. The Court concludes that it does not have capacity to sue and is not a proper plaintiff in this action. Divel further contends that One Triple's lack of capacity to sue offers a separate basis on which to grant summary judgment. That question is more challenging.

As to the first issue, Divel contends that One Triple "has been suspended by the California Franchise Tax Board since on or about October 1, 2019" and has never been reinstated. ECF 90-1, at 27; ECF 90-12, at 2 (listing inactive date as "10/01/2019"). That suspension occurred over twenty months before the instant action was filed. ECF 90-1, at 28. Divel argues that its

11

suspension has stripped One Triple of its capacity to participate in this litigation. *See id.* at 27–28. The individual Plaintiffs admit that One Triple is "technically unable to sue in California in its own name, having been suspended by the California Franchise Tax Board," but argue "that does not mean that claims belonging to the LLC cannot be carried on through its members" where, for example, an assignment of the claims has occurred. ECF 93, at 14–15. Moreover, the individual Plaintiffs contend that the incapacity does not doom their separate claims. *See id.*

Section 23301 of California's Revenue and Taxation Code provides that, except for certain limited purposes, "the powers, rights, and privileges of a domestic taxpayer may be suspended, and the exercise of the powers, rights, and privileges of a foreign taxpayer in this state may be forfeited," when the taxpayer fails to pay required taxes. Cal. Rev. & Tax. Code § 23301. "[A] corporation suspended for failure to pay taxes under Revenue and Taxation Code section 23301" is "disabled from participating in any litigation activities." *Palm Valley Homeowners Ass'n, Inc. v. Design MTC*, 102 Cal. Rptr. 2d 350, 354–55 (Cal. Ct. App. 2000); *Bozzio v. EMI Grp. Ltd.*, 811 F.3d 1144, 1149 (9th Cir. 2016) ("The suspension of the corporate powers, rights, and privileges means a suspended corporation cannot sue or defend a lawsuit while its taxes remain unpaid." (quoting *Kaufman & Broad Cmts., Inc. v. Performance Plastering, Inc.*, 39 Cal. Rptr. 3d 33, 36 (Cal. Ct. App. 2006))). One Triple is thus an improper plaintiff in this action, and the claims which belong to it may not proceed.[6]

---

[6] Neither can the individual Plaintiffs argue that they were validly assigned any claims belonging to One Triple in 2024. *See* ECF 90-13, at 2 (November 27, 2024 assignment of choses in action purporting to transfer One Triple's claims to the individual Plaintiffs). At the time of the assignment, One Triple was already in suspended status. *See* ECF 90-12, at 2. Under California law, "[t]he assignee stands in the shoes of the assignor, taking his rights and remedies, subject to *any defenses* which the *obligor* has against the assignor prior to notice of the assignment." *Cal-W. Bus. Servs., Inc. v. Corning Cap. Grp.*, 163 Cal. Rptr. 3d 911, 916 (Cal. Ct. App. 2013) (emphasis in original) (internal quotations omitted). Accordingly, "[w]hen an assignee acquires a claim from a corporation lacking capacity to sue under Revenue and Taxation Code section 23301,

12

Plaintiffs argue that the absence of capacity to sue is of no matter, however, as the claims "that exclusively belonged to the LLC are not before the Court" any longer as a result of the Court's prior decision on the motion to dismiss. ECF 93, at 15. Plaintiffs assert that "[w]hen the Court dismissed the breach of contract claim and rejected alter ego liability," what remained were the misrepresentation claims. *Id.* And according to Plaintiffs, "a fraudster is liable to all those damaged by his fraudulent actions," including the individual Plaintiffs in this action, not just the LLC. ECF 93, at 15. Divel responds that "[t]o the extent Plaintiffs' damages claims depend on rights belonging to One Triple Two (including the right to receive the unpaid balance of the purchase price, the value of the business sold, or lost profits) those claims fail as a matter of law because they belong to a suspended entity that cannot prosecute them, and the November 2024 assignment from a suspended entity cannot convey rights the assignor could not itself exercise." ECF 96, at 15.

The Court agrees with Plaintiffs insofar as they contend that the misrepresentation claims do not belong only to One Triple. The individual Plaintiffs argue that *they also* justifiably relied on a misrepresentation communicated to them by Divel's alleged agent, Windham. *See generally* ECF 93. Those claims are cognizable for the individual Plaintiffs as well. But the question of whether Dodge, Lasseter, and Berkowitz, as managing members of One Triple, can assert "out of pocket," lost profit, and consequential damages from the misrepresentation is more difficult to answer. Accordingly, the Court must determine (1) whether an individual plaintiff may recover damages allegedly incurred by an LLC as a result of the plaintiff's injury, and (2) whether the damages claims were in fact injuries incurred by the LLC here.

---

the assignee takes upon itself the same lack of capacity." *Casiopea Bovet, LLC v. Chiang*, 219 Cal. Rptr. 3d 157, 162 (Cal. Ct. App. 2017).

Though not in application of California law, the Fourth Circuit has before considered how the distinction between individual and corporation weighs on an individual plaintiff's evidence of damages. *See Terry v. Yancey*, 344 F.2d 789, 790 (4th Cir. 1965). In *Terry v. Yancey*, the plaintiff, a resident of Indiana, brought an action "to recover damages for personal injuries sustained in an automobile collision" that occurred in Virginia. *Id.* at 789. A jury awarded the plaintiff damages, but the plaintiff was "dissatisfied with the amount of the award because of the exclusion of certain testimony relating to the cost of employing a substitute salesman" and appealed. *Id.* The plaintiff was a "sole stockholder" of a corporation selling automobiles and claimed "that because of the injuries sustained in the accident, his sales ability [was] impaired," requiring him to hire an additional salesman. *Id.* at 790.

Upholding the district court's exclusion of that evidence, the Fourth Circuit observed that the plaintiff's employment of the salesman "was done as an officer of the corporation, and not as an individual." *Id.* "A corporation is, of course, an entity separate and apart from its officers and stockholders, and where an individual creates a corporation as a means of carrying out his business purposes he may not ignore the existence of the corporation in order to avoid its disadvantages." *Id.* (first citing *Comm'r of Internal Revenue v. Schaefer*, 240 F.2d 381 (2d Cir. 1957); and then citing *Schenley Distillers Corp. v. United States*, 326 U.S. 432 (1946)). Although the district judge in *Terry* had "repeatedly offered to admit testimony bearing on the reasonable value of any loss of services, or any loss of salary or other compensation, attributable to the accident," it rightly "excluded evidence tending to show losses sustained by the corporation." *Id.* "Other courts have followed the Fourth Circuit's example and held that an individual plaintiff may not recover damages allegedly incurred by a corporation as a result of the plaintiff's injury." *Greenburg v.*

14

*Cure*, No. 12-2107-EFM, 2013 WL 1767792, at *3 & n.19 (D. Kan. Apr. 24, 2013) (collecting cases).

It appears that California courts have not addressed the question of whether an individual plaintiff may recover damages allegedly incurred by an LLC as a result of the plaintiff's injury in this precise context. But California courts have recognized a like principle in the context of shareholder suits—namely, that "a shareholder may not, as a matter of law, personally recover emotional distress damages for injury *to the corporation* in which he holds shares." *Tan Jay Internat., Ltd. v. Canadian Indem. Co.*, 243 Cal. Rptr. 907, 912 (Cal. Ct. App. 1988) (emphasis in original). "One individual does not, under [California] law, become entitled to a damage award for injuries sustained by another, and a corporation is a distinct legal entity apart from its shareholders." *Id.* (citing *Jones v. H.F. Ahmanson & Co.*, 460 P.2d 464 (1969)). Based on the prevalence of this uncontroversial principle in California case law, the Court concludes that California courts would share this Court's concern about Plaintiffs' disregard of the corporate form with respect to their damages claims.

That conclusion accords with the benefits afforded to the individual Plaintiffs by creating an LLC. "The corporate form generally insulates shareholders from personal liability for the corporation's debts, because those debts are not imputed to the shareholders." *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 385 (4th Cir. 2018). "Like a corporation, an LLC also generally protects its 'members' from personal liability for the LLC's debts." *Id.* (citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008)). That principle is no different in California. *See Pac. Bell Tel. Co. v. 88 Connection Corp.*, No. 15-CV-04554-LB, 2016 WL 3257656, at *5 n.19 (N.D. Cal. June 14, 2016) ("The core and legitimate purpose of incorporation, after all, is to limit personal liability for business ventures."). The individual Plaintiffs received

15

these benefits from their LLC; they may not now "ignore the existence of the corporation in order to avoid its disadvantages." *Terry*, 344 F.2d at 790.

Plaintiffs allege that they have established four types of damages: "out of pocket" damages, lost profits, other consequential damages, and punitive damages. *See* ECF 93, at 10–13. Describing the first type, Plaintiffs contend that their "out of pocket" damages are "the difference between what the plaintiff[s] received for the sale of its property and the fair market value of that property at the time of the transaction." *Id.* at 10. But at least some of the property in question— certain business assets that were the subject of the Purchase Agreement—were owned by One Triple, as defined by the agreement itself—not the individual Plaintiffs. *See* ECF 90-6, at 4.("'One Triple Assets' shall mean all of the assets owned by One Triple as of the Execution Date, as more specifically set forth in Schedule 2.02."). Stated differently, even if such "out of pocket" damages are an appropriate measure of damages for these claims, the individual Plaintiffs cannot say that *their* property was the entire subject of the fraudulent purchase at issue. *See* Cal. Civ. Code § 3343(a) ("One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value *of that with which the defrauded person parted* and the actual value of that which he received, together with any additional damage arising from the particular transaction . . . ." (emphasis added)). The only transferred assets which appear to have belong to the individual Plaintiffs were the shares in Portland Innovations. *See* ECF 90-6, at 2, 6; *see also* ECF 90-32, at 8 (assignment and transfer of stock).

A similar issue arises with respect to the lost profit damages the individual Plaintiffs claim. Berkowitz's declaration asserts lost profits of $1,800,000. ECF 93, at 11 (citing ECF 93-2, at 7 ¶ 33 ("Finally, plaintiffs calculate that they could potentially have earned $1,800,000 in profits from their growing operations in the premises, had plaintiffs not shut down our grow operations in

16

reliance upon Divel's false representations of adequate funding to purchase the assets and, instead, continued to operate our cannabis business.")). However, claiming such losses as damages to the *individual* Plaintiffs would ignore the existence of the corporate form involved. Those profits, if lost, were One Triple's, not the individual Plaintiffs', who presumably were entitled only to a portion of such profits through their salaries and/or other interests in the company. The individual Plaintiffs thus cannot claim that they are entitled to damages in the form of lost profits from their LLC. *Cf. Greenburg*, 2013 WL 1767792, at *4 ("Greenburg cannot, as a matter of law, submit a claim to the jury that he is entitled to damages for lost profits from the LLC. Cure is therefore entitled to summary judgment on Greenburg's claim for recovery of his LLC's lost profits.")

Of course, had the individual Plaintiffs pointed to "any loss of salary or other compensation," *id.*, related to their employment at One Triple and attributable to the alleged misrepresentation, such evidence would be relevant to an assessment of their damages. But the Court has not identified any such evidence in this record. The Court has been provided with the capital contributions of Dodge, Lasseter, and Berkowitz in One Triple and their corresponding percentage interests in the LLC ($5,500 or 55%, $4,000 or 40%, and $500 or 5%, respectively). ECF 90-6, at 117; *see also* ECF 90-29 (deposition of Lasseter), at 8:75 ("Q. Do you recall what your ownership interest was in . . . One Triple Two, LLC? . . . A: 40 percent."). But that information does not inform a reasonable factfinder of what losses were suffered by Dodge, Lasseter, and Berkowitz as *individuals*.

With respect to "other consequential damages," Plaintiffs "are seeking $400,000 for the amount that they had to expend to comply with the purchase agreement requirement that the premises supply 1600 amps of power." ECF 93, at 12 (citing ECF 93-2, at 7 ¶ 33). "In addition," Plaintiffs complain that they "had to pay $34,941.14 to the landlord for repairs" to the property.

17

*Id.* at 12–13. Plaintiffs provide no evidence of such expenses other than Berkowitz's declaration. *See* ECF 93-2, at 7 ¶ 33; ECF 96, at 4. Regardless, with respect to the amount purportedly paid to the landlord for repairs, the Court observes that the commercial lease for the premises at issue was between the landlord and One Triple, not the individual Plaintiffs. *See* ECF 90-9, at 2 (commercial lease agreement between Hemmat d/b/a Five 10, LLC and One Triple); ECF 90-6, at 103 ("A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement."). Although as a practical matter the Court has doubts about whether the individual Plaintiffs, rather than One Triple, fronted the costs of the $400,000 electrical upgrade, taking all inferences in favor of the non-moving party, the Court concludes that there is a genuine dispute of material fact as to whether the individual Plaintiffs or the LLC bore such costs, and thus summary judgment will not be granted on the basis of who fronted these costs.

Accordingly, the Court finds that the individual Plaintiffs are unable to assert lost profit damages, and their "out of pocket" damages theory is necessarily limited to the fair market value of the assets that they actually owned that are at issue in the Purchase Agreement, namely the Portland Innovations stock.[7]

## B. Damages and Causation

The Court next assesses the individual Plaintiffs' variety of claimed damages and their viability on this record. First, in light of the Court's above conclusion about the effects of One Triple's incapacity, the Court sets to the side Plaintiffs' lost profits claim resulting from their

---

[7] Of course, the individual Plaintiffs' attempt to recover punitive damages does not inherently reflect a loss to the corporation. *See* ECF 93, at 13. But the Court notes that, under California law, "punitive damages cannot be awarded without actual damages." *Fassberg Constr. Co. v. Hous. Auth. of City of Los Angeles*, 60 Cal. Rptr. 3d 375, 408 (Cal. Ct. App. 2007) (collecting cases).

18

assertion that they "would not have shut down their cannabis business" as a result of the alleged misrepresentation. *See* ECF 93, at 13. Second, the Court likewise rejects any alleged damages arising from the rejection of "alternative purchasers." *See id.* "[I]t is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'" *Piscitelli v. Friedenberg*, 105 Cal. Rptr. 2d 88, 113 (Cal. Ct. App. 2001) (*Frustuck v. City of Fairfax*, 28 Cal. Rptr. 357 (Cal. Ct. App. 1963)). There is no evidence on this record upon which a factfinder could conclude with any reasonable certainty that Plaintiffs rejected legitimate alternative purchasers of their business in light of the deal with TPC 1222. Plaintiffs have acknowledged under oath that at the time they were "negotiating and entering into the Purchase Agreement with TCP 1222, LLC, there were not other advanced alternative buyers." ECF 90-17, at 6. Although Berkowitz stated in his text messages to Windham that there were other interested parties, he stated at his deposition that he may have been dishonest "just to make people more interested." ECF 90-31, at 2; ECF 90-26, at 9:150; *id.* at 11:165.

However, in Berkowitz's declaration attached to his opposition, he provides a copy of a purchase agreement purportedly draft by "Amenta, LLC, a California limited liability company" for the purchase of Plaintiffs' business "for a price of $2,500,000.00." ECF 93-2, at 6 ¶ 29; *see also* ECF 93-10 (purchase agreement between One Triple, Portland Innovations, and Amenta, LLC). Berkowitz asserts that he "was in the process of negotiating a sale transaction in November 2018 with Amenta, when, in reliance on Divel's assurances that TCP 1222, LLC had the funds to purchase the assets," [he] stopped negotiations with Amenta, LLC and proceeded with executing the Original Purchase Agreement with Divel on November 26, 2018." *Id.* Divel has filed a motion for the Court to take judicial notice of the official records of the California Secretary of State, which Divel asserts as evidence that "only one entity has ever been registered in the State of

19

California under the name 'Amenta LLC,'" and it was terminated on "September 13, 2004." ECF 97, at 2. According to Divel, such evidence at minimum confirms that the agreement with Amenta, LLC "could not have resulted in an enforceable agreement." *Id.* at 4. Plaintiffs have filed no response to Divel's motion for judicial notice.

"It is well-settled that a party opposing summary judgment cannot create a factual dispute by identifying a conflict between sworn deposition testimony and a subsequent affidavit contradicting the prior testimony." *McCallum v. Archstone Communities LLC*, Civ. No. JFM-12-01529, 2013 WL 5496837, at *5 (D. Md. Oct. 2, 2013) (citing *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011)). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *In re Family Dollar FLSA Litig.*, 637 F.3d at 513. "Therefore, courts should disregard assertions in affidavits that are inconsistent with prior testimony when deciding whether to grant summary judgment." *McCallum*, 2013 WL 5496837, at *5 (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 976 (4th Cir. 1990)).

"[I]n order for this rule to apply, there must be a 'bona fide inconsistency' between the earlier and later testimony, so courts must carefully examine whether the prior testimony is actually inconsistent with what was offered later." *Id.* (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001)). The Court has no trouble concluding that there is a bona fide inconsistency between Berkowitz's previous sworn assertion that at the time they were "negotiating and entering into the Purchase Agreement with TCP 1222, LLC, there were not other advanced alternative buyers," ECF 90-18, at 6, and his assertion that he could not identify any specific other potential purchaser of the business, ECF 90-26, at 11:167 (deposition of

20

Berkowitz),[8] and the subsequent assertion in Berkowitz's declaration that he "was in the process of negotiating a sale transaction in November 2018 with Amenta," ECF 93-2, at 6 ¶ 29.

Additionally, the Court will grant ECF 97 and take judicial notice of the official records of the California Secretary of State attached to Divel's motion. *See* ECF 97 (motion); ECF 97-1 (California business search); ECF 97-2 (limited liability company certificate of cancellation for "AMENTA LLC," executed by an individual residing in Oakland, California). The Fourth Circuit and "numerous" other courts "routinely take judicial notice of information contained on state and federal government websites." *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017). Moreover, the Court may take judicial notice of official public records. *See, e.g., Hoops v. United Bank*, Civ. No. 3:22-0072, 2022 WL 2400039, at *5 n.4 (S.D.W. Va. July 1, 2022) ("[T]his Court may take judicial notice of the business registration records maintained by the State because they are matters of public record."); *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 486 (E.D. Va. 2018) (taking judicial notice of a Virginia Department of Transportation report because it "is a public report of a governmental agency, and Plaintiff has not disputed its authenticity"). Because Plaintiffs have not disputed the authenticity of records, which come from the California Secretary of State and its official website, the Court will take judicial notice of such records. In doing so, the Court concludes that no reasonable factfinder could find the purported unsigned purchase agreement with "Amenta, LLC" to reflect the loss of an alternative buyer capable of establishing non-speculative damages in this case.

That leaves the Court to consider any "out of pocket" damages claimed related to the individual Plaintiffs' stock in Portland Innovations, "$400,000 for the amount that they had to

---

[8] Specifically, Berkowitz was asked if he could "identify any other potential purchaser" of the business, to which he responded "Specifically identify? No." ECF 90-26, at 11:167. He further agreed he was not aware of any documentation identifying any such potential purchasers. *Id.*

expend to comply with the purchase agreement requirement that the premises supply 1600 amps of power," and the "$34,941.14 to the landlord for repairs" to the property." ECF 93, at 12–13. The Court will address each in turn.

First, the Court addresses Plaintiffs' claim for "out of pocket" damages. Section 3343 of the California Civil Code provides that "[o]ne defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction." Cal. Civ. Code § 3343(a). However, "[n]othing in th[at] section shall . . . [p]ermit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof" or deny other available legal or equitable remedies to the defrauded person. *Id.* § 3343(b).

The California Supreme Court has explained that "[t]he 'out-of-pocket' measure of damages 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.'" *All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 610 (Cal. 1995) (quoting *Stout v. Turney*, 586 P.2d 1228, 1232 (Cal. 1978)). Divel agrees that the sale of Plaintiffs' business here falls within the meaning of § 3343 and thus that statute provides the exclusive measure of damages for Plaintiffs. ECF 90-1, at 16; *Fragale v. Faulkner*, 1 Cal. Rptr. 3d 616, 621 (Cal. Ct. App. 2003) ("Civil Code section 3343 provides the exclusive measure of damages for fraud in such cases.").

Accordingly, Divel argues that "the relevant comparison is between what Plaintiffs actually gave up and what they actually received." ECF 90-1, at 17. But as Divel points out, in sum· "Plaintiffs parted with the business assets . . . for a matter of months, later recovering them in full

22

through the Surrender of Collateral Agreement." *Id.* For the individual Plaintiffs to recover for any loss with respect to their stock, they would need to produce some evidence of "the difference in the value of the stock" between when it was given and when it was returned. *Zinn v. Ex-Cell-O Corp.*, 149 P.2d 177, 181 (Cal. 1944). The individual Plaintiffs here have provided no such evidence. Instead, they have generally estimated the fair market value of the total business assets transferred in the deal but fail to take into account the fact that they received those assets back. *See* ECF 93-2, at 5 ¶ 26 ("As an owner of the assets sold, I am privileged to testify as to the value of the assets. I believed at the time of the transaction and I believe now that the fair market value of the assets that the plaintiffs were selling to TCP 1222, LLC in November 2018 was the $2,550,000.00 purchase price, as amended.")[9]; *cf. Papenfus v. Webb Prods. Co.*, 75 P.2d 631, 633 (Cal. Ct. App. 1938) ("It may be observed that even on this theory there is no evidence as to the amount of damages suffered by the appellant. There is some testimony as to the value of the assets transferred by him to the corporation, but there is no evidence as to the value of what he received from the corporation aside from the stock certificate, which he says is worthless."). The record simply does not support sending the question of the value of the loss of Portland Innovations stock for two months to a trier of fact.

What remains to be considered are the $34,941.14 in repairs and the $400,000 cost of the electrical upgrade. Such expenses might be categorized as "additional damage arising from the particular transaction, including . . . [a]mounts actually and reasonably expended in reliance upon

---

[9] Specifically, Berkowitz asserts that his valuation is based on "(1) Plaintiffs projections of sales of cannabis using the assets; (2) the sales price that a willing buyer, TCP 1222, LLC, was willing to pay a willing seller, plaintiffs, in an arms length transaction; (3) profitable performance in 2017 and 2018; and (4) sale prices discussed with other potential purchasers." ECF 93-2, at 5 ¶ 26. His valuation does not differentiate between the assets at issue in the Purchase Agreement (e.g., One Triple Assets vs. Portland Shares).

the fraud." Cal. Civ. Code § 3343(a)(1). But at this point, Plaintiffs must still factor in the "actual value of that which [they] received" in the transaction. *Id.* After all, § 3343 is "directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.'" *All. Mortg. Co.*, 900 P.2d at 610. Plaintiffs do not dispute that they were paid and retained $400,000 from TPC 1222. *See, e.g.*, ECF 93, at 5 ¶ 22, at 11. Accordingly, Plaintiffs may not recover out-of-pocket damages related to the electrical upgrade. That leaves $34,941.14 of claimed damages for repairs.[10]

Divel argues that the misrepresentation claims "independently fail because [Plaintiffs] cannot establish proximate causation" for the alleged damages. ECF 90-1, at 25. Plaintiffs counter that "[w]ere it not for Divels' false representations that TCP 1222 had the funds or binding commitments from financial institutions to fund the purchase transaction, plaintiffs would not . . . have paid the landlord $34,941.14 for physical damages to the premises." *Id.* at 13–14.

"To recover damages for fraud, a plaintiff must have sustained damages proximately caused by the misrepresentation." *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 1 Cal. Rptr. 2d. 301, 319 (Cal. Ct. App. 1991) (first citing *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, 88 Cal. Rptr. 246, 258 (Cal. Ct. App. 1970); then citing Cal. Civ. Code § 3333 ("For the breach of an

---

[10] Divel argues that such an amount is unable to support the $75,000 jurisdictional threshold for diversity jurisdiction under 28 U.S.C. § 1332 on which this case is founded. *See* ECF 1 ("This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) . . . ."); *MRC Assocs., LLC on behalf of Granite Hill Funding, LLC v. Cook*, Civ. No. 24-1261-BAH, 2025 WL 35930, at *2 (D. Md. Jan. 6, 2025) ("Diversity jurisdiction requires complete diversity of citizenship and an amount in controversy over $75,000."). However, "[i]t is well established that the requirements of diversity jurisdiction, including the amount in controversy, are measured as of the date the case is filed in federal court or removed from state court." *MHD-Rockland Inc. v. Aerospace Distributors Inc.*, Civ. No. CCB-13-2442, 2014 WL 31677 (D. Md. Jan. 3, 2014) (collecting cases). What happens subsequent does not strip the Court of jurisdiction. *See id.*

obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."); and then citing Cal. Civ. Code § 3343 (providing for "out of pocket" damages for fraud arising out of the purchase, sale, or exchange of property and lost profits under certain conditions).

The question for the Court is whether Plaintiffs have established a genuine dispute of material fact as to whether Divel's alleged misrepresentation proximately caused the repair damages. Plaintiff's Rule 26 disclosures identified "Costs to Repair Leased Premises" as $34,941.14. ECF 90-35, at 4. The response to interrogatories also identify that amount as "collateral." ECF 90-18, at 5. Further, in Berkowitz's declaration, he simply states that "plaintiffs had to spend $34,941.14 to repair the leased premises because of damage that TCP 1222, LLC caused through its negligence, which was an amount demanded by the landlord." ECF 93-2, at 7 ¶ 33. However, as Divel notes, "[de]spite the specificity" of this figure Plaintiffs offer no other evidence supporting the existence of such damages. ECF 97, at 13. And while testimony alone could theoretically be sufficient to create a genuine dispute of material fact, there is no record evidence that explains how the alleged misrepresentation proximately caused the repair costs.

In the absence of *any* context as to those costs, the Court concludes that the individual Plaintiffs have failed to establish a genuine dispute of material fact that the damages they can claim in this matter were proximately caused by Divel's alleged misrepresentations. Accordingly, Divel is entitled to summary judgment.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Divel's motion for summary judgment and motion for judicial notice are granted.  A separate implementing order will issue.

Dated: <u>July 30, 2026</u>

<u>            /s/            </u>
Brendan A. Hurson
United States District Judge
